## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Arthur Stanton,

                Plaintiff,

                          Case No. 1:17-cv-2309-MLB

v.

The NCR Pension Plan, et al.,

                Defendants.

_____/

## **OPINION & ORDER**

Plaintiff Arthur Stanton worked for NCR Corporation ("NCR") and says he is entitled to benefits under its pension plan.  Defendants, the NCR Pension Plan, the Pension and Benefits Committee of the NCR Pension Plan, NCR (as plan administrator), Linda Fayne Levinson, Edward P. Boykin, Gary J. Daichendt, Chinh E. Chu, and Richard T. McGuire, say otherwise[1].  Plaintiff brought this lawsuit claiming Defendants violated ERISA, specifically 29 U.S.C. §§ 1132(A)(1)(B),

_____

[1] Plaintiff also sued Defendant Andrea Ledford, but the Court previously dismissed Defendant Ledford from the case on November 18, 2019.  (Dkt. 26.)

1132(A)(3), and 1132(c)(1)(B).  Defendants move for summary judgment. (Dkt. 84.)   The Court grants that motion.   Plaintiff moves for partial summary judgment.  (Dkt. 83.)  The Court denies that motion.

## I.   Background[2]

### A.   Pension Plans

At all material times, NCR has sponsored and maintained a defined benefit pension plan for the benefit of its eligible employees, although the plan and its name changed from time to time.  (Dkts. 83-1 ¶ 27; 92 ¶ 27.) Effective January 1, 1963, NCR adopted the NCR Retirement Plan ("1963 Plan").   (Dkts. 84-2 ¶ 65; 90-1 ¶ 65.)   Then, effective January 1, 1969, NCR adopted the Retirement Plan for Management Employees of the National Cash Register Company ("1969 Plan").  (Dkts. 84-2 ¶ 66; 90-1 ¶ 66.)  It then adopted the Retirement Plan for Salaried Employees of the National Cash Register Company effective January 1, 1972 ("1972 Plan").

---

[2] Plaintiff's statement of material facts violates the Court's Local Rules. The Local Rules provide "[a] movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of material facts. . . . Each material fact must be numbered separately."  LR 56.1(B)(1), NDGa.  Throughout Plaintiff's statement of facts, he combines numerous allegations into a single paragraph.  There is one instance in which he includes seven separate facts into one paragraph.  (Dkt. 83-1 ¶ 69.)  The Court admonishes Plaintiff for violating the Local Rule.  The rule is clear and should be followed.

(Dkts. 84-2 ¶ 69; 90-1 ¶ 69.)  Then, as effective January 1, 1974, NCR adopted the Retirement Plan for Salaried Employees of the National Cash Register Company ("1974 Plan").  (Dkts. 84-2 ¶ 72; 90-1 ¶ 72.)  The 1969, 1972, and 1974 Plans provide that to be a participant, an employee must have completed ten or more years of "Credited Service."  (Dkts. 84-2 ¶¶ 67, 70, 73; 90-1 ¶¶ 67, 70, 73; 84-25 at 5; 84-26 at 7; 84-27 at 7.)  The three Plans define credited service as the period of full-time continuous employment by NCR up to the date of the participant's retirement or other termination of employment.  (Dkts. 84-2 ¶¶ 68, 71, 74; 90-1 ¶¶ 68, 71, 74; 84-25 at 7; 84-26 at 9; 84-27 at 10; 83-1 ¶ 34; 92 ¶ 34.)  "Such determination shall be subject to the following rules: . . . [a]bsence on authorized leave of absence" will "not break continuous employment and the period absent shall be included in Credited Service."[3]  (Dkt. 84-25 at 7.)

NCR adopted the Retirement Plan for Salaried Employees of NCR Corporation ("1976 Plan") as of January 1, 1976.  (Dkts. 84-2 ¶ 75; 90-1

---

[3] The 1972 and 1974 Plans state, "[a]bsence on authorized leave of absence determined in accordance with uniform rules applicable to all Employees similarly situated shall not break continuous employment and the period absent shall be included in Credited Service." (Dkts. 84-26 at 9; 84-27 at 10 (emphasis added).)

¶ 75.)  It created the Retirement Committee.  (Dkt. 84-28 at 3.)  The 1976 Plan provides "the Retirement Committee shall have the sole responsibility for the administration of this Plan," shall "have the authority to control and manage the operation and administration of the Plan," shall "make all determinations as to the right of any person to a benefit," and shall have the power to "construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder."  (Dkts. 92 at 59–60; 97-1 ¶¶ 4–7.)

The 1976 Plan stated that "any person who immediately prior to January 1, 1976 was an Employee as defined in the Plan at that time" could participate.  (Dkts. 83-1 ¶ 30; 92 ¶ 30.)  Under the 1976 Plan, a participant would be a vested participant when he or she completed ten or more Years of Service or worked for NCR until retirement.  (Dkts. 84-2 ¶ 76; 90-1 ¶ 76; 84-28 at 8; 83-1 ¶ 32; 92 ¶ 32.)  The 1976 Plan defines Years of Service as (1) for period on or after January 1, 1976, plan years during which a participant completes 1,000 or more hours of service and (2) for periods prior to January 1, 1976, periods of credited service under the Plan as in effect before that date.  (Dkts. 84-2 ¶ 77; 90-1 ¶ 77; 84-28

at 4; 83-1 ¶¶ 33, 39; 92 ¶¶ 33, 39.)  Years of Service excludes "[a]ny period prior to January 1, 1976 which was disregarded as Credited Service under the provisions of the Plan which were in effect prior to such date." (*Id.*)   None of the Plans in effect from 1969 through 1976 defined "authorized leave of absence."   (*See generally* Dkts. 84-25; 84-26; 84-27; 84-28.)  But NCR's "HR Manager – Benefits," Heather Mills, testified by declaration that

> an "authorized leave of absence" at NCR means only those absences that are authorized prior to an employee's departure from NCR to leave for a legitimate personal, non work-related reason and who is expected to return after a short period of time. In order to obtain an "authorized leave of absence," an employee must receive approval from an NCR representative with the authority to make such a representation before the employee leaves NCR for the absence period.

(Dkt. 84-5 ¶ 4.)  She also testified that "[a]uthorized leaves of absence do not apply retroactively and do not apply to allow employees to take employment at an employer other than NCR."  (*Id.* ¶ 6.)

On January 1, 1976, NCR adopted a Summary Plan Description ("SPD") for the 1976 Plan which provides that a participant will become vested when they have completed ten Years of Service ("1976 SPD"). (Dkts. 84-2 ¶ 78; 90-1 ¶ 78; 84-29 at 5.)  The 1976 SPD also states that Years of Service for vesting will be based on the same rules in the 1976

Plan.  (Dkts. 84-2 ¶ 79; 90-1 ¶ 79; 84-29 at 13.)  Effective April 1, 2013, NCR adopted a new SPD ("2013 SPD").  (Dkts. 84-2 ¶ 80; 90-1 ¶ 80; 84-31.)

As amended and effective January 1, 2016, NCR adopted the NCR Pension Plan ("2016 Plan").  (Dkts. 84-2 ¶ 80; 90-1 ¶ 80; 84-30.)  The 2016 Plan provides the Plan Administration Committee[4] is the Plan Administrator, but the Committee does not pay benefits out of its own funds.  (Dkts. 84-30 at 90; 84-14 ¶ 5.)  According to Mandy M. Cruz Rivera, the Benefits Manager for NCR, NCR funds benefits for the Plan.  (Dkt. 84-14 ¶ 5.)  Under the 2016 Plan,

> [t]he Plan Administrator shall have all powers necessary or appropriate to carry out its duties, including the discretionary authority to interpret the provisions of the Plan and the facts and circumstances of claims for benefits, including, without limitation, questions of the eligibility of any person to participate in the Plan and the amounts payable to any person under the Plan. When making a determination or calculation, the Plan Administrator shall be entitled to rely upon information furnished by a Participant or Beneficiary, the Company, the legal counsel of the Company, the Plan actuary or Trustee or such other person or entity as it may determine appropriate. Any interpretation or construction of or action by the Plan Administrator with respect to the administration of the Plan shall be conclusive and binding upon any and all parties affected thereby, subject to the exclusive appeal

---

[4] The Committee was created on October 22, 2014.  (Dkts. 84-2 ¶ 105; 90-1 ¶ 105.)

procedure set forth in this Article 8. In addition, the Plan Administrator shall have full authority to interpret, apply and enforce the provisions of the Plan. . . . The Plan Administrator shall have the authority to make such rules and regulations for the administration of the Plan and the interpretation and application of the provisions hereof, as it deems necessary or desirable. Any determination by the Plan Administrator within the scope of its authority and any action taken thereon in good faith shall be conclusive and binding on all persons.

(Dkts. 84-2 ¶ 81; 90-1 ¶ 81; 84-30 at 91–92; 83-1 ¶ 44; 92 ¶ 44.)

## B. Plaintiff's Career

Plaintiff began working for NCR in October 1961 as a Student Salesman in Lorain, Ohio (part of NCR's Cleveland, Ohio branch).  (Dkts. 84-2 ¶ 1; 90-1 ¶ 1; 83-1 ¶ 1; 92 ¶ 1.)  Plaintiff signed a Student Salesman contract on October 11, 1961.  (*Id.*)  All individuals employed as salesmen were required to have a salesman contract in place.  (Dkts. 84-2 ¶ 4; 90-1 ¶ 4; 82-1 at 18:24–19:2.)  About six months after starting with NCR, Plaintiff became a Junior Salesman and signed a Junior Salesman contract.  (Dkts. 84-2 ¶ 6; 90-1 ¶ 6.)  In November 1963, Plaintiff was promoted to Senior Salesman by the then-Cleveland branch manager, Mr. Hale.  (Dkts. 84-2 ¶ 7; 90-1 ¶ 7.)

The Cleveland branch then appointed Lewis Mayrose branch manager, replacing Mr. Hale.  (Dkts. 84-2 ¶ 8; 90-1 ¶ 8.)  Plaintiff had a

"severe conflict" with Mr. Mayrose.  (Dkts. 84-2 ¶ 9; 90-1 ¶ 9; 82-1 at 24:24–25:2, 29:14.)   On May 24, 1968, Plaintiff wrote a letter to Mr. Mayrose stating:

> I respectfully submit that because of the lack of co-operation between the office and the cash register organization in general and myself in particular, that I be permitted the opportunity to discuss these problems or have the opportunity to transfer to another branch of my approval without prejudice. I feel too strongly about my obligations to my customers, my family, myself, and my company to permit present conditions to continue.

(Dkts. 84-2 ¶ 10; 90-1 ¶ 10; 83-5 at 29.)  The main reason for the conflict was lack of equipment.  (Dkt. 82-1 at 26:12–22.)  In July 1968, Plaintiff transferred to the Akron, Ohio branch.  (Dkts. 84-2 ¶ 13; 90-1 ¶ 13.) Plaintiff began reporting to a new branch manager, E.M. Gullia.  (Dkts. 84-2 ¶ 14; 90-1 ¶ 14.)

Plaintiff's father passed away in September 1968.  (Dkts. 84-2 ¶ 15; 90-1 ¶ 15; 83-1 ¶ 5; 92 ¶ 5.)  The 12-month period following his father's death was a confusing time for Plaintiff because of the Vietnam war and his father's death.  (Dkts. 83-1 ¶ 5; 92 ¶ 5.)  Plaintiff's father and Plaintiff's uncle owned a machining company called Noble and Stanton. (Dkts. 84-2 ¶ 16; 90-1 ¶ 16.)  Following his father's death, Plaintiff helped his mother and uncle decide what to do with the company.  (Dkts. 92 at

60; 97-1 ¶ 8.)   Plaintiff was "making arrangements to rearrange [his] NCR into . . . [he] guess[es] put it down perhaps a leave of absence." (Dkt. 82-1 at 36:11–14.)   Plaintiff thought he was going to work for Noble and Stanton.   But his uncle "ended up backing away" and buying Plaintiff's mother out of the business.   (Dkts. 84-2 ¶ 17; 90-1 ¶ 17; 82-1 at 36:2–6.) Plaintiff talked to Mr. Gullia many times about the situation with Nobel and Stanton and Mr. Gullia "was very supportive."   (Dkts. 82-1 at 36:15– 17; 83-1 ¶ 6; 92 ¶ 6.)   Mr. Gullia did not say, if Plaintiff left to join Noble and Stanton, that would be considered a leave of absence from NCR but he said Plaintiff would always have a job at NCR and "everything [Plaintiff has] will be restored."   (Dkt. 82-1 at 37:11–13, 76:10–17.) According to Plaintiff, the terminology—authorized leave of absence— was not used in 1969.   (Dkts. 84-2 ¶ 25; 90-1 ¶ 25; 82-1 at 46:25–47:3, 76:18–77:4.)

Around July 1969, Mr. Mayrose was promoted to vice president and began overseeing Plaintiff's region.   (Dkts. 84-2 ¶ 18; 90-1 ¶ 18.)   Plaintiff felt Mr. Mayrose was "stifling his future" and was "told by people . . . that [Mr. Mayrose] had basically done everything in his power to prevent [Plaintiff] from doing anything more" for NCR.   (*Id.*)   Plaintiff believed

Mr. Mayrose wanted Plaintiff "out of the company." (*Id*.)  Around the same time, Plaintiff was recruited to work for Sanders Data Systems ("Sanders").  (Dkts. 84-2 ¶ 20; 90-1 ¶ 20.)  Plaintiff interviewed with Sanders while he was still employed by NCR.  (Dkts. 84-2 ¶ 21; 90-1 ¶ 21.)  In September or October 1969, Plaintiff accepted the job with Sanders.  (Dkt. 82-1 at 40:22–42:19.)

On September 15, 1969, Plaintiff sent a letter to Mr. Gullia officially authorizing rescission and cancellation of his contract.  (Dkts. 84-11; 83-1 ¶ 8; 92 ¶ 8.)  When Plaintiff submitted this letter, he did not know if he intended to come back to NCR.  (Dkt. 82-1 at 48:3–5.)  In the letter, Plaintiff stated, if any problem arise at NCR, he would help resolve them.  (*Id*. at 48:6–11.)  Plaintiff's contract terminated September 20, 1969.  (Dkts. 84-12; 83-1 ¶ 8; 92 ¶ 8.)  The contract termination notice stated the reason for termination was "[t]o take position as manager of electronics firm."  (Dkts. 92 at 60–61; 97-1 ¶ 9; 84-12 at 2.)  When Plaintiff provided his resignation letter, NCR knew he was going to Sanders.  (Dkts. 92 at 61; 97-1 ¶ 10.)  Plaintiff insists that, regardless of these letters, Mr. Gullia had agreed he could take a leave of absence and that his departure was considered a termination "because [NCR's] internal

forms did not provide an option to discontinue pay based on leave, approved or otherwise." (Dkt. 83-5 at 129–30.)  Plaintiff then worked for Sanders for almost two years—from October 1, 1969 through August 1971. (Dkts. 84-2 ¶ 28; 90-1 ¶ 28.)

In the summer of 1971, Mr. Gullia died.  (Dkts. 83-1 ¶ 12; 92 ¶ 12.) At his funeral, Plaintiff spoke to David Banning, a friend who still who worked for NCR.  (Dkts. 84-2 ¶ 29; 90-1 ¶ 29; 83-1 ¶ 12; 92 ¶ 12.)  Mr. Banning told him NCR wanted him back, could offer him a higher salary, and agreed to restore his fringe benefits and adjust his years of service. (Dkts. 84-2 ¶ 30; 90-1 ¶ 30; 82-1 at 60:22–61:2.)  Mr. Banning also said Mr. Mayrose had left the company.  (Dkts. 84-2 ¶ 32; 90-1 ¶ 32; 92 at 61– 62; 97-1 ¶ 15.)  Plaintiff was tired of working alone in an office for Sanders, so it was an opportune time for him to go back to NCR.  (Dkts. 84-2 ¶ 31; 90-1 ¶ 31.)

After the funeral, Plaintiff met with Mr. Banning, Jim Medlar (an NCR administrative manager for the Cleveland branch), and Bill Buerner (a branch manager for the Cleveland branch) to discuss the terms of his return. (Dkts. 84-2 ¶ 33; 90-1 ¶ 33; 83-1 ¶ 13; 92 ¶ 13.) They went over the paperwork, which was filled out before Plaintiff arrived,

and "basically it was a done deal when [Plaintiff] walked back into the office of NCR." (Dkts. 84-2 ¶ 33; 90-1 ¶ 33.)  Mr. Banning, Mr. Medlar, and Mr. Buerner specifically said Plaintiff's time with Sanders was considered an authorized leave of absence and his years of service before 1969 would be credited towards his pension. (Dkt. 82-1 at 65:1–5, 65:18–25.)  Plaintiff did not ask them for anything in writing confirming that representation.  (*Id.* at 67:1–5.)  Mr. Banning, Mr. Medlar, and Mr. Buerner did not work for the employee benefits department of NCR.  (*Id.* at 64:11–17, 65:1–8.)  Mr. Banning and Mr. Medlar also did not say their statements about Plaintiff's return was on behalf of NCR Pension Plan. (*Id.* at 103:4–7.)  Plaintiff "never talked to anybody in employee benefits." (*Id.* at 102:13–14.)

Plaintiff returned to NCR effective August 16, 1971 and joined the Cleveland branch where Mr. Banning was his supervisor. (Dkts. 84-2 ¶ 39; 90-1 ¶ 39; 83-1 ¶ 14; 92 ¶ 14.)  Plaintiff's employee number and job title were restored. (Dkts. 83-1 ¶ 15; 92 ¶ 15.)  Upon Plaintiff's return, he completed and signed a "Request for New Hire or Transfer Replacement" which stated "[d]esire to fill open territory." (Dkt. 84-16.) Don Chapman, a former salesperson who worked for Plaintiff, testified

by declaration that he remembers Mr. Breuner announcing during a sales meeting in the fall of 1971 that Plaintiff had just returned from a leave of absence and that all his benefits were being reinstated or continued as if he had never left.  (Dkts. 83-1 ¶ 66; 92 ¶ 66.)

Effective October 1, 1976, Plaintiff was promoted to retail district manager and transferred to Hartford, Connecticut.  (Dkts. 83-4 at 75–77; 83-1 ¶ 19; 92 ¶ 19.)  John Feighenbaum was the retail administrative district manager in Hartford.   (Dkts. 84-2 ¶ 46; 90-1 ¶ 46.)   Mr. Feighenbaum did not work in the employee benefits department.  (*Id.*)  In June 1977, Plaintiff and Mr. Feighenbaum were co-managers of the same office so they did not report to each other.  (Dkts. 84-2 ¶ 47; 90-1 ¶ 47.)  But according to Plaintiff, at that time, "everything with NCR went through administrative manager."  (Dkt. 82-1 at 94:16–17.)  On June 8, 1977, Plaintiff wrote an intraoffice memorandum to Mr. Feighenbaum confirming the time Plaintiff had been away from the company would be deducted from his original employment date for all benefits including the start date of credited service on retirement benefits.  (Dkts. 84-19; 83-1 ¶ 19; 92 ¶ 19.)  Mr. Feighenbaum forwarded the letter to NCR's employee benefits department "because they're the ones that have to change the

13

records, make sure it's correct."  (Dkts. 84-2 ¶¶ 49–50; 90-1 ¶¶ 49–50; 82-1 at 101:12–14; 83-1 ¶ 19; 92 ¶ 19.)  Plaintiff never received an answer and "was too involved in all the other responsibilities" to follow up.  (Dkt. 82-1 at 96:13–19.)

Plaintiff resigned from NCR in November 1979.  (Dkts. 84-21; 83-1 ¶ 20; 92 ¶ 20.)  Plaintiff's employee masterfile data records from August 1977 through December 19, 1979 (one month after Plaintiff's resignation) show Plaintiff's adjusted date for credited service was never changed from August 16, 1971.  (Dkt. 84-20.)  In July 1972, NCR did complete an "Employee Profile and Change Notice" in which it adjusted Plaintiff's date of hire to September 7, 1963.  (Dkts. 83-4 at 56; 83-1 ¶ 18; 92 ¶ 18.)

When Plaintiff left NCR in 1979, he had an exit interview with Mr. Feighenbaum and signed a terminating employee checklist which provides "[t]he following items are to be reviewed with all terminating employees to insure a common understanding between the employee and NCR at the time of the employee's departure from NCR."  (Dkts. 84-2 ¶ 55; 90-1 ¶ 55; 84-22; 83-1 ¶ 21; 92 ¶ 21.)  The checklist provided Plaintiff had a right to convert his group medical coverage into an individual policy only.  (Dkts. 83-1 ¶ 22; 92 ¶ 22.)  The checklist also provided:

> Retirement Plan. Employees with ten or more years of benefits service are vested in the NCR Retirement Plan and are eligible for a pension to commence on or after age 55. United States Data Processing Group Employee Benefits and Records Department will send the terminating employee a written notification of the NCR Retirement Plan Rights and Options. . . . Should a terminating employee have any questions about breaks in employment, his/her status in the retirement plan, or request more information regarding any aspect of employee benefits, see the personnel policy manual or contact United States Data Processing Group Employee Benefits and Records Department.

(Dkts. 84-2 ¶ 55; 90-1 ¶ 55; 84-22; 83-1 ¶¶ 23–24; 92 ¶¶ 23–24.)  Plaintiff never received any document from the Plan saying he was vested in the Plan.  (Dkts. 84-2 ¶ 57; 90-1 ¶ 57.)  Plaintiff never received any document when he turned 65 to defer pension payments.  (Dkts. 84-2 ¶ 86; 90-1 ¶ 86.)  Plaintiff never received an estimate of how much a pension would be from NCR.  (Dkt. 82-1 at 50:11–19, 85:12–24, 109:5–21.)  Plaintiff never estimated how much a pension would pay him and never made plans for what he would do with a pension from NCR.  (Dkts. 92 at 63; 97-1 ¶ 26.)  Plaintiff contacted no one about NCR pension benefits between June 1977 and June 2016.  (Dkts. 84-2 ¶ 58; 90-1 ¶ 58.)  Near the time of Plaintiff's resignation, he corresponded with Mr. Feighenbaum about health coverage and a refund from the stock purchase plan, but not pension benefits.  (Dkts. 84-2 ¶ 59; 90-1 ¶ 59.)

Plaintiff testified he did not take any actions in reliance on his belief that he would receive a pension from NCR.  (Dkt. 82-1 at 128:4–7.)

Upon leaving NCR, Plaintiff went to work at another company and remained in the workforce until 2015 when he retired.  (Dkts. 83-1 ¶ 26; 92 ¶ 26.)

When he terminated employment with NCR, Plaintiff thought he "was covered." (Dkts. 83-1 ¶ 72; 92 ¶ 72; 82-1 at 108:13–16.)  In response to whether Plaintiff refrained from doing anything he normally would have done based on not receiving a pension for NCR, he testified that he moved in with his son and daughter-in-law sometime between March 2016 and March 2018 so he has limited expenses.  (Dkts. 83-1 ¶ 72; 92 ¶ 72, at 64; 82-1 at 126:15–21; 97-1 ¶ 27.)  One reason Plaintiff moved in with his family was because he did not get a pension from NCR.  (Dkt. 82-1 at 127:11–13.)  He also moved in with them because his wife is 80 years old and he is 82 years old and they cannot "do all the things that [they] used to like to do . . . based on [their] physical capabilities." (*Id.* at 127:23–128:1.)

### C.   Plaintiff's Claim and Appeal

In June 2016, Plaintiff called the NCR Benefits Center "to get [his] benefits." (Dkts. 84-2 ¶ 82; 90-1 ¶ 82; 82-1 at 130:4–6; 83-1 ¶ 45; 92 ¶ 45.) Before making the claim, Plaintiff spoke with Mr. Chapman who had already received his own pension benefits.  (Dkts. 84-2 ¶ 84; 90-1 ¶ 84; 82-1 at 130:7–20.)   Plaintiff testified that Mr. Chapman asked Plaintiff whether he would get the buyout and Plaintiff responded "well, I'm not getting it. And so that kind of got [him] thinking about, well, maybe [he] better call and find out where [his] benefits are." (Dkts. 84-2 ¶ 85; 90-1 ¶ 85; 82-1 at 130:13–20.)   Plaintiff had not asked about his benefits sooner because he was still working and did not need them.  (Dkts. 83-1 ¶ 45; 92 ¶ 45.)

On June 20, 2016, the NCR Benefits Center sent Plaintiff a letter in response to his call.  (Dkts. 84-32; 83-1 ¶ 46; 92 ¶ 46.)  The letter requested Plaintiff send a copy of the Statement of Accrued Vested Right Plaintiff received upon termination from NCR.  (Dkts. 84-32 at 2; 83-1 ¶ 47; 92 ¶ 47.)  Plaintiff responded saying he had not received any such statement.  (Dkts. 84-33 at 2; 83-1 ¶ 48; 92 ¶ 48.)  Plaintiff then sent the Benefits Center a chronology of his service at NCR.  (Dkts. 84-33 at 4; 83-

1 ¶ 49; 92 ¶ 49.)   On July 15, 2016, Plaintiff called the NCR Benefits Center to follow up on his inquiry.  (Dkts. 83-1 ¶ 50; 92 ¶ 50.)  Following the call, Plaintiff requested, and the NCR Benefits Center received, Plaintiff's itemized social security statement of earnings from 1961 through 1979.  (Dkts. 84-2 ¶ 90; 90-1 ¶ 90; 83-1 ¶¶ 51, 53; 92 ¶¶ 51, 53.)  By letter dated December 28, 2016, the NCR Benefits Center informed Plaintiff he was not eligible for a pension benefit under the Plan because he did not work for NCR for ten consecutive years as required under the 1976 Plan.  (Dkt. 84-35 at 2.)

On February 7, 2017, Plaintiff, through counsel, submitted a formal claim for benefits.  (Dkts. 84-2 ¶ 92; 90-1 ¶ 92; 83-1 ¶ 55; 92 ¶ 55.)  Plaintiff's counsel concluded his letter by requesting "all documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, copies of the latest annual report (Form 5500 series), and copies of all plan documents."  (Dkts. 83-1 ¶ 56; 92 ¶ 56; 83-3 at 388.)   On March 9, 2017, Plaintiff, through counsel, submitted a nearly identical letter to Edward Gallagher, NCR's General Counsel.  (Dkts. 84-2 ¶ 92; 90-1 ¶ 92; 83-1 ¶ 56; 92 ¶ 56.)  The February 7, 2017 letter was not provided to the Committee until after Plaintiff sent

NCR's general counsel the same letter on March 9, 2017. (Dkts. 92 at 64; 97-1 ¶ 30.) The 2016 Plan was in effect at the time of Plaintiff's claim for benefits. (Dkts. 84-2 ¶ 93; 90-1 ¶ 93.) It required the Committee to review the terms of the 1976 Plan to determine whether Plaintiff was vested. (Dkts. 92 at 65; 97-1 ¶ 32.)

By letter dated March 27, 2017, the Committee denied Plaintiff's claim finding Plaintiff did not work 10 full continuous years for NCR before he worked for Sanders or after he returned to NCR as required by the 1976 Plan and Plaintiff's resignation to join Sanders was not an authorized leave of absence based on the 1976 Plan and the plan documents in effect before that. (Dkts. 84-2 ¶ 98; 90-1 ¶ 98; 83-1 ¶ 57; 92 ¶ 57.) The Committee stated that it reviewed Plaintiff's February 7, 2017 claim letter; Plaintiff's June 27, 2016 letter; NCR's records; the records of the Plan (including plan documents and SPDs); the itemized statement of earning provided by the social security administration; and Plaintiff's March 9, 2017 letter to Mr. Gallagher. (Dkt. 84-37 at 2–3.) The Committee also provided all documents it said were responsive to Plaintiff's attorney's request but did not produce a 1972 or 1980 SPD because those documents did not exist. (Dkts. 84-2 ¶ 98; 90-1 ¶ 98; 83-1

¶ 60; 92 ¶ 60, at 65; 97-1 ¶ 31.)  The Committee also requested Plaintiff provide, for consideration, a copy of a letter from the 1970s Plaintiff claims was sent from the Cleveland NCR branch to the headquarters in Dayton, Ohio stating all Plaintiff's benefits would be reinstated, including full participation in the pension plan as if he had not left the company, because the Committee did not have record of this correspondence.  (Dkts. 84-37 at 3; 83-1 ¶ 58; 92 ¶ 58.)  The Committee performed a search for the letter, but never found one.  (Dkts. 92 at 63; 97-1 ¶ 23.)  (Plaintiff's February 7, 2017 letter to the Committee had referenced the prior correspondence.)

By letter dated April 4, 2017, Plaintiff appealed the Committee's claim denial and requested the Committee send SPDs in effect in 1972, 1980, and at present.  (Dkts. 84-2 ¶ 99; 90-1 ¶ 99; 84-38; 83-1 ¶ 61; 92 ¶ 61.)  On May 8, 2017, the Committee upheld the denial on Plaintiff's appeal for the same reasons it denied Plaintiff's claim.  (Dkts. 84-2 ¶ 100; 90-1 ¶ 100; 83-1 ¶ 62; 92 ¶ 62.)  In its letter, the Committee stated that it reviewed Plaintiff's April 4, 2017 appeal letter; the Committee's March 27, 2017 letter; and all other documents originally reviewed.  (Dkt. 84-39 at 2.)  The Committee did not conduct interviews during the

administrative appeal. (Dkts. 83-1 ¶ 65; 92 ¶ 65.) The Committee seldom considers personnel files in deciding benefit claims as they ordinarily do not contain benefits-related information. (Dkts. 92 at 63; 97-1 ¶ 22.) The Committee provided Plaintiff additional documents. (Dkts. 84-2 ¶ 101; 90-1 ¶ 101.) By letter dated May 13, 2017, Plaintiff's attorney requested the SPDs in effect between 1961 and 1969 and notified the Committee that pages were missing from the 1974 Plan document previously produced. (Dkts. 84-2 ¶ 101; 90-1 ¶ 101; 83-1 ¶ 63; 92 ¶ 63.) By letter dated June 13, 2017, the Committee provided the 1963 Plan document and SPD, the SPD for the 1969 Plan, and a complete copy of the 1974 Plan document. (Dkts. 84-2 ¶ 101; 90-1 ¶ 101; 83-1 ¶ 64; 92 ¶ 64.)

Plaintiff sued the Plan, NCR as the Administrator of the Plan, the Plan's Pension and Benefits Committee, and individuals who either work for NCR on the Plan or serve on the Plan's Pension and Benefits Committee. He claims (1) NCR and the Plan wrongfully denied his claim for benefits under 29 U.S.C. § 1132(a)(1)(B); (2) Defendants, except the Plan, breached their fiduciary duties under 29 U.S.C. § 1132(a)(3) by representations made to Plaintiff, and (3) Defendants, except for the Plan, violated 29 U.S.C. § 1132(c)(1)(B). (Dkt. 28 ¶¶ 68–92.) None of the

individual Defendants served on the Committee or were involved in the review of, or decision to deny, Plaintiff's claim and appeal for benefits. (Dkts. 84-2 ¶ 103; 90-1 ¶ 103.)  Plaintiff has never communicated with any of the individual Defendants.  (Dkts. 84-2 ¶ 104; 90-1 ¶ 104.)

## II.   Discussion

Defendants move for summary judgment on all Plaintiff's claims. (Dkt. 84.)  Plaintiff moves for partial summary judgment on his claim for benefits under 29 U.S.C. § 1132(a)(1)(B), penalties under 29 U.S.C. § 1132(c), and for an award of attorney fees under 29 U.S.C. § 1132(g)(1). (Dkt. 83.)

### A.   Count I -- Denial of Benefits

ERISA § 502(a)(1)(B) provides that:

A civil action may be brought—(1) by a participant or beneficiary . . . (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).  If a participant in a retirement plan believes the benefits promised to him or her are not being provided, he or she may bring suit seeking recovery of those benefits.  Plaintiff brings a claim for wrongful denial of benefits against NCR and the Plan.

22

In reviewing whether summary judgment is proper on an ERISA

§ 502(a)(1)(B) claim, courts in the Eleventh Circuit apply a six-part test:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he [or she] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he [or she] was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his [or her] decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he [or she] operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

"[A] pertinent conflict of interest exists where the ERISA plan

administrator both makes eligibility decisions and pays awarded benefits

out of its own funds." *Id.* "A plaintiff suing under [29 U.S.C. § 1132(a)(1)(B)] bears the burden of proving his [or her] entitlement to contractual benefits." *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

Defendants argue Plaintiff's claim, which seeks relief against NCR and the Plan, must be dismissed (even without applying this six-part test) because Plaintiff failed to seek relief from a party able to provide the requested relief—the Plan Administration Committee. (Dkt. 84-1 at 13.) Plaintiff contends it did not need to name the Committee. (Dkt. 97 at 2–4.)

"[T]he case law of this circuit demonstrates that an order enjoining the payment of benefits from an ERISA plan must issue against a party capable of providing the relief requested." *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 908 (11th Cir. 1997). "The proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997); *see also Hamilton v. Allen-Bradley Co., Inc.*, 244 F.3d 819, 824 (11th Cir. 2001) ("In the Eleventh Circuit, [29 U.S.C. § 1132(a)(1)(B)] confers a right to sue the plan administrator for

recovery of benefits." (citing *Rosen v. TRW, Inc.*, 979 F.2d 191, 193–94 (11th Cir. 1992))). "Proof of who is the plan administrator may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." *Hamilton*, 244 F.3d at 824 (citing *Rosen*, 979 F.2d at 193). "The key question on this issue is whether [NCR] had sufficient decisional control over the claim process that would qualify it as a plan administrator under *Rosen*." *Id.* And "only a 'current plan administrator can pay out benefits' under an ERISA plan." *Nelson v. Group Acc. Ins. Plan*, No. 3:13-CV-234, 2013 WL 6080071, at *3 (M.D. Ala. Nov. 19, 2013) (quoting *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998)). "[A] former plan administrator with no present control or discretion over a plan is incapable of providing a plaintiff relief under the plan and, thus, is not a proper defendant on a § 502(a)(1)(B) claim." *Id.* at *4. It is thus NCR's present role that determines whether it is a proper defendant.

The 2016 Plan provides: "The Plan Administration Committee shall be responsible for the administration of the Plan, other than the investment and reinvestment of the assets of the Plan, and shall be the

'Plan Administrator' for the Plan." (Dkt. 84-30 at 90.) The clear language of the Plan names the Committee as the plan administrator and specifies the authority to control the Plan lies with that entity. NCR is thus not the named administrator.

Plaintiff, however, argues NCR was a "de facto fiduciary that helped control administration of the Plan" because it (1) ratified Mr. Gullia's authorization for Plaintiff to take a leave of absence and (2) appointed claim fiduciaries under the 1976 Plan. (Dkt. 90 at 10.) But these actions occurred, if at all, in the 1970s and have no relation to whether NCR administered the plan in 2017. They also fail to demonstrate—or raise any factual dispute as to—whether NCR had any authority over the *claims process* in 2017. *See Hamilton*, 244 F.3d at 824 ("The key question on this issue is whether [NCR] had sufficient decisional control over *the claim process* that would qualify it as a plan administrator under *Rosen*." (emphasis added)).

Plaintiff's own pleadings undermine his argument that NCR was the de facto administrator. In his briefs, Plaintiff contends the *Committee* decided his claim for benefits. (*See* Dkts. 83-2 at 3 ("The Committee was de novo wrong in deciding otherwise."), 23 ("This Court

should hold under the first step of *Blankenship* that the Committee's decision to deny Plaintiff's claim was de novo wrong."), 25 ("In short, the Committee incorrectly determined that Plaintiff was not vested under the 1976 Plan at the time of his termination in 1979.").)  The March 27, 2017 and May 8, 2017 letters also show the Committee reviewed Plaintiff's claim, advised Plaintiff to direct his appeal to the Committee, and upheld the denial.  (Dkts. 84-37; 84-39.)

Finally, Plaintiff argues NCR must be a de facto administrator because the "2016 SPD" identified NCR as the Plan Administrator.  (Dkt. 90 at 6, 11 (*citing* Dkt. 83-3, p. 635).)  The document to which Plaintiff cites is the document identified by the Court as the 2013 SPD.  (Dkt. 84-31.)  That SPD was effective as of April 1, 2013.  (Dkts. 84-2 ¶ 80; 90-1 ¶ 80; 84-31.)  It is thus unclear why Plaintiff calls the document the "2016 SPD" and that date is not supported by any fact in the record.  As of April 2013, NCR *was* the named plan administrator.  (Dkt. 84-31 at 33.)  But on October 22, 2014, the Committee was created and named plan administrator, as set forth in the 2016 Plan.  (Dkts. 84-2 ¶ 105; 90-1 ¶ 105; 84-30 at 90.)  So, a document issued in 2013 has no bearing on changes made the next year.

And even if the document was in effect in 2016, that would make no difference. Statutorily required plan summaries—like the SPD at issue here— "do not themselves constitute the *terms* of the plan for purposes of ERISA 502(a)(1)(B)." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011). Plaintiff even concedes the "2016 SPD" is not a Plan document. (Dkt. 90-1 ¶ 80.) The 2013 SPD thus does not clarify NCR's present role.

The 2016 Plan clearly identifies the Committee—not NCR—as plan administrator. And, Plaintiff has failed to present any issue of material fact suggesting NCR acted as the de facto administrator. Plaintiff's failure to name the proper defendant is fatal to this request for relief. *See Hunt*, 119 F.3d at 908 ("[T]he case law of this circuit demonstrates that an order enjoining the payment of benefits from an ERISA plan must issue against a party capable of providing the relief requested").

In a footnote in his reply to his motion for summary judgment, Plaintiff requests, if the Court finds NCR is an improper defendant, the Court allow him leave to amend his pleadings to add the Committee as a defendant to Count I. (Dkt. 97 at 4 n.1.) He argues the Committee would not be prejudiced because it already responded to Plaintiff's motion as if

it were a party to Count I and had notice of this claim since the action began.  (*Id.*)

On October 1, 2020, the parties submitted their Joint Preliminary Report and Discovery Plan, wherein they agreed that "[a]mendments to the pleadings submitted LATER THAN THIRTY (30) DAYS after the preliminary report is filed, or should have been filed, will not be accepted for filing, unless otherwise permitted by law." (Dkt. 52 at 7.)  On October 5, 2020, the Court entered a Scheduling Order, which ordered "[t]he time limits for . . . amending the pleadings . . . are as set out in the Federal Rules of Civil Procedure and the Local Rules of this Court." (Dkt. 56 at 1.)  The deadlines in the Joint Preliminary Report and Discovery Plan track the Court's Local Rules.  *See* LR 7.1(A)(2), NDGa.  Plaintiff filed his reply brief on June 18, 2021, many months after the Scheduling Order's deadline.  "[W]hen a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 n.2 (11th Cir. 1998) (per curiam).  Rule 16 provides that the scheduling order "may be modified only for good cause and with the judge's consent," Fed. R. Civ. P. 16(b)(4), which "precludes modification unless the

schedule cannot be met despite the diligence of the party seeking the extension," *Sosa*, 133 F.3d at 1418 (internal quotation marks omitted). "This means that 'the likelihood of obtaining permission to amend diminishes drastically after the court enters a scheduling order with deadlines for amendments that have expired.'" *Kozyrev v. Ponomarenko*, No. 19-cv-60497, 2020 WL 977635, at *1 (S.D. Fla. Feb. 28, 2020) (citation omitted).

The Court denies Plaintiff's request for leave to amend. First, Plaintiff never filed a motion to amend. Second, Plaintiff "fails to cite to—let alone address—the good cause standard of Rule 16" which "alone is enough to deny [Plaintiff] leave to amend." *Gallagher Benefit Servs., Inc. v. Campbell*, No. 1:19-cv-836, 2020 WL 3404935, at *2 (N.D. Ga. June 11, 2020) (colleting cases). Third, Plaintiff requests leave in a footnote in his reply brief. *See Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009). Fourth, Plaintiff makes this request over two years after he filed his amended complaint, over six months after the Scheduling Order's deadline, and in a summary judgment filing. The Eleventh Circuit has repeatedly found delays of this length preclude amendment. *See Pugh v. Kobelco Const. Mach. Am., LLC*, 413 F. App'x 134, 136 (11th Cir. 2011)

(denying motion to amend filed "more than three months after the expiration of the deadline for amending pleadings"); *Goolsby v. Gain Techs., Inc.*, 362 F. App'x 123, 128–29 (11th Cir. 2010) (denying motion to amend filed "nearly two months *after* the parties' deadline for amending the pleadings"); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1242–43 (11th Cir. 2009) (denying motion to amend filed five months after scheduling order's deadline, almost a month after both parties filed their initial summary judgment briefs, and "a few weeks" after fact discovery closed); *see also Lowe's Home Ctrs., Inc. v. Olin Corp.*, 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions.").

For all of these reasons, the Court denies Plaintiff's request, denies Plaintiff's motion for summary judgment, and grants Defendants' motion for summary judgment as to Count I.

## B.    Count II -- Breach of Fiduciary Duty

"One of the principal purposes of ERISA is 'to protect ... the interests of participants . . . and . . . beneficiaries . . . by establishing

31

standards of conduct, responsibility, and obligation for fiduciaries . . . and . . . providing for appropriate remedies . . . and ready access to the Federal courts.'" *Jones v. Am. Gen. Life and Acc. Ins. Co.*, 370 F.3d 1065, 1072 (11th Cir. 2004) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 513 (1996)). As a result, ERISA Section 404(a) obligates fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries." *See* 29 U.S.C. § 1104(a). A plan participant thus has a right to "accurate information, and . . . an ERISA plan administrator's withholding of information [or dissemination of inaccurate information] may give rise to a cause of action for breach of fiduciary duty." *Jones*, 370 F.3d at 1072.

Plaintiff brings a claim for breach of fiduciary duty under ERISA § 502(a)(3) (29 U.S.C. § 1132(A)(3)) against all Defendants except the Plan claiming these Defendants affirmatively misrepresented they had ratified Mr. Gullia's authorization that Plaintiff could take a leave of absence from the company in 1971. (Dkts. 28 ¶¶ 73–87; 90 at 22.) Defendants move for summary judgment contending the undisputed evidence shows (1) there were no misrepresentations made by any Defendants; (2) the only individuals who arguably made a misrepresentation were not fiduciaries; (3) any alleged

misrepresentation was not a fiduciary act and there was no intent to deceive; (4) Plaintiff did not detrimentally rely on any alleged misrepresentation; and (5) Plaintiff's claim is barred by the statute of limitations. (Dkt. 84-1 at 21–27.) In reviewing Plaintiff's Section 502(a)(3) claim, "summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1236 (11th Cir. 2010).

"To establish a claim for breach of fiduciary duty under ERISA, a plaintiff must generally show that the defendants are fiduciaries, that the defendants breached their fiduciary duties, and the breach(es) caused harm." *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892, at *37 (S.D. Fla. Aug. 7, 2007) (citing *Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 465 (7th Cir. 2005); *Roth v. Swayer Cleartor Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994)); *see also Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005) ("To establish liability for a breach of fiduciary duty under any of the provisions of ERISA § 502(a), a plaintiff must first show that the defendant is in fact a fiduciary with respect to the plan."). ERISA provides that

> a person is a fiduciary with respect to a plan to the extent (i)
> he exercises any discretionary authority or discretionary
> control respecting management of such plan or exercises any
> authority or control respecting management or disposition of
> its assets, (ii) he renders investment advice for a fee or other
> compensation, direct or indirect, with respect to any moneys
> or other property of such plan, or has any authority or
> responsibility to do so, or (iii) he has any discretionary
> authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A). "[A] party is a fiduciary only 'to the extent' that

it performs a fiduciary function." *Cotton*, 402 F.3d at 1277. "[F]iduciary

status under ERISA is not an 'all-or-nothing concept,' and 'a court must

ask whether a person is a fiduciary with respect to the particular activity

at issue.'" *Id.* (quoting *Coleman v. Nationwide Ins. Co.*, 969 F.2d 54, 61

(4th Cir. 1992)).

Defendants contend the individual Defendants are not fiduciaries

of the Plan. (Dkt. 84-1 at 22.) None of the individual Defendants served

on the Committee or were involved in the review of, or decision to deny,

Plaintiff's claim and appeal for benefits. (Dkts. 84-2 ¶ 103; 90-1 ¶ 103.)

The individual Defendants served as NCR's Board of Directors. (Dkt. 90-

1 ¶ 103 (conceding individual Defendants "served on NCR's Board of

Directors at the time Plaintiff filed his claim for benefits").)

Plaintiff argues this is irrelevant because "NCR, at all relevant times a *de facto* fiduciary under the 1976 Plan, may act only through its Board of Directors." (Dkt. 90 at 23.)   Plaintiff reasons "[b]ecause the individual Defendants all served on NCR's Board of Directors [when] Plaintiff filed his claim for benefits, each of them was a *de facto* ERISA fiduciary as well." (*Id.* at 24 (footnote omitted).)   And "[k]nowing of the prior fiduciary breaches and failing to cure them, the individual defendants have co-fiduciary liability under ERISA." (*Id.* (citing 29 U.S.C. § 1105).)

The Court rejects this argument.   Directors are directors of a company, not employees with responsibility for any day-to-day operations.   Perhaps, some directors could have some responsibility for some operation of a company in some instance.   But, Plaintiff presents no evidence these directors had any discretionary authority over the plan or its administration and the Court refuses to adopt a rule finding a corporation's directors automatically qualify as plan fiduciaries.   The individual Defendants have shown an absence of any disputed fact as to their lack of involvement in administering the plan and, accordingly, that

they are not fiduciaries as a matter of law.  The Court grants their motion for summary judgment as to Count II.

Plaintiff's fiduciary duty claims against NCR begin with Plaintiff's claim that, in 1969, Mr. Gullia told him that he could take an approved leave of absence and essentially papered his departure as a "termination" because NCR did not otherwise have a method of discontinuing pay based on leave.  (Dkt. 90 at 5.)  Plaintiff also claims that, when he returned to the company in 1971, Mr. Banning, Mr. Medlar, and Mr. Buerner said his time with Sanders was considered an authorized leave of absence and his years of service before 1969 would be credited towards his pension. (Dkt. 82-1 at 65:1–5, 65:18–25.)   Defendants argue these alleged representations could not support a breach of fiduciary duty claim because these individuals were not fiduciaries or de facto fiduciaries. (Dkt. 84-01 at 21-22.)  So, Defendants move for summary judgment on Plaintiff's fiduciary duty claim against NCR.

In response, Plaintiff does not rely on the alleged statements in 1969 by Mr. Gullia or the alleged statement in 1971 by Mr. Banning and

the others.[5]   Instead, he alleges that, after 1976, NCR "affirmatively

misrepresented that it had ratified Mr. [Gullia's] authorization."[6]  (Dkt.

90 at 22.)  Plaintiff cites to the terminating employee checklist completed

after his 1979 termination; the employee profile and change notice

adjusting his date of hire to September 7, 1963;[7] a receipt of US price list;

his Employee Record Card; an inter-office memo about US price list;

salesman contracts; his self-made chronology; and his deposition.  (Dkt.

90 at 22.)  Finally, Plaintiff relies on the 2013 SPD which states: "**If You**

---

[5] While Plaintiff does not rely on pre-1976 statements by Mr. Gullia, Mr. Banning, Mr. Medlar, or Mr. Buerner, the Court has considered those statements and concludes they could not support a claim for breach of fiduciary duty as there is no evidence those individuals had a fiduciary duty to Plaintiff under any plan.

[6] The Court notes Plaintiff's arguments at summary judgment differ from his allegations contained in the complaint.  In the complaint, Plaintiff claims Defendants breached their fiduciary duties by, among other things, breaching promises of benefits and retroactively amending the Plan; failing to notify him of an opportunity to convert benefits to a lump-sum distribution; failing to afford him the opportunity to know about and, therefore, take early distribution of benefits; and failing to provide him notice of his rights under the plan.  (Dkt. 28 ¶ 78.)  He did not, at summary judgment, address this discrepancy.

[7] The Committee noted "[t]he company may have counted [Plaintiff's] previous service . . . for vacation purposes, but the Pension Plan rules are different and there were no break in service rules at the time of [Plaintiff's] termination."  (Dkt. 83-10.)  Plaintiff provides no evidence to support his theory that his start date was adjusted October 11, 1961 to September 7, 1963 for anything other than vacation purposes.

**Left and Were Rehired Before January 1, 1976.** Your periods of service will be combined for vesting purposes. Past service, which was recognized under the Pension Plan . . . at the time, was restored when you were rehired, regardless of the break." (Dkt. 84-31 at 9.)

Accepting these facts as true, the Court concludes Defendant NCR is entitled to summary judgment on Plaintiff's fiduciary duty claim. None of the post-1976 statements Plaintiff relies upon were made to him. The employee profile and change notice; receipt of US price list; Employee Record Card; and inter-office memo about US price list were all simply retained in Plaintiff's employee record. They were not sent to him until this litigation began. The terminating employee checklist and salesman contracts were given to Plaintiff, but there is no claim anything in those documents was a misrepresentation. Plaintiff's self-made chronology obviously was not made *to him* since he was the one who made the timeline. There is no deposition testimony from Plaintiff showing any post-1976 misrepresentations made to him. And the 2013 SPD appears to have been given to Plaintiff for the first time on March 27, 2017 as part of the Committee's response to his attorney's document requests. (Dkt. 84-37 at 3–4.) Plaintiff also appears to contend the 2013 SPD is accurate

(allowing combination of years regardless of break) and thus cannot be considered a misrepresentation.  Plaintiff has, therefore failed to raise an issue of material fact as to whether NCR mad a false representation to him.

Defendant NCR would also be entitled to summary judgment because Plaintiff has failed to raise an issue of material fact that he was harmed by NCR's alleged post-1976 representations.   Defendants contend Plaintiff must establish he relied on NCR's misrepresentation to his detriment.   (Dkt. 84-1 at 21.)   But detrimental reliance is not absolutely necessary for such a claim. *Amara*, 563 U.S. at 444 ("[A]ctual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents.").   Certainly, a plaintiff must prove harm, but that harm need not include detrimental reliance.  In this case, Plaintiff alleges "he suffered harm as a result of the lack of disclosure and misrepresentations."  (Dkt. 90 at 23.)  But he cites only his deposition testimony that, as a result of being denied a pension, he moved in with his son.  (*Id.*)  By his own admission, this alleged harm resulted from the Committee's denial of his claim, not because of any misrepresentations

he identified in support of his fiduciary duty claim. *See Pledger v. Reliance Trust Co.*, No. 1:15-CV-4444, 2019 WL 10886802, at \*28 (N.D. Ga. Mar. 28, 2019) (collecting cases establishing a breach of fiduciary duty claim requires the breach to have *caused* harm to the plaintiff); *Silverman v. Mutual Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) ("[Plaintiff] must show some causal link between the alleged breach of Principal's duties and the loss plaintiff seeks to recover."); *Brieger v. Tellabs, Inc.*, No. 06 C 1882, 2009 WL 720975, at \*1 (N.D. Ill. Mar. 16, 2009) ("[I]f a plaintiff based an ERISA breach of fiduciary duty claim solely on the defendant's affirmative misrepresentations, it would be difficult, if not impossible, to establish causation without proving detrimental reliance."). So, even if Plaintiff proved NCR was a fiduciary and breached its fiduciary duties, he still could not prevail because there is no evidence he was harmed because of the alleged misrepresentations.

Plaintiff names the Committee as a defendant in Count II. The undisputed facts show the Committee was formed in 2014. (Dkts. 84-2 ¶ 105; 90-1 ¶ 105.) It, therefore, could not have made any of the statements Plaintiff identifies from his return to NCR in 1971 until his departure in 1979. There is also no evidence the Committee was responsible for the

2013 SPD and, even if it were, such a document cannot be relied upon to alter or amend a plan.  And, even if it could, Plaintiff has not shown how he was damaged by that document, particularly considering he did not receive it until March 27, 2017.   The Court thus also grants the Committee summary judgment on Count II.

Finally, Defendants argue Plaintiff's claim is barred by the statute of limitations and the alleged breach occurred before ERISA was enacted. (Dkt. 84-1 at 25–28.)  The Court agrees Plaintiff has failed to identify a representation made to him, upon which he relied or that otherwise proximately caused him any harm, during the statutory period.  In the end, the only representations Plaintiff says were actually made to him were the alleged representation by Mr. Gullia in 1969 that he could take a leave of absence from NCR after his father's death and the statement in 1971 by Mr. Banning, Mr. Medlar, and Mr. Buerner upon Plaintiff's return to NCR  that the company considered his departure an authorized leave of absence and that his years of service before 1969 would be credited towards his pension.  But, those alleged representations are not a part of his claim.

The Court thus grants Defendants' motion as to Plaintiff's breach of fiduciary duty claim.

## C.   Penalties

Plaintiff brings a claim under 29 U.S.C. § 1132(c)(1)(B) against the Committee, NCR, and the individual Defendants.  (Dkt. 28 ¶¶ 88–92.) "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4) (footnote omitted).  "ERISA section 502(c)(1)(B) imposes civil liability on any plan administrator who fails or refuses to comply with a request for any information which such administrator is required by ERISA to furnish to a participant." *Middlebrooks v. St. Coletta of Greater Wash., Inc.*, No. 1:10cv653, 2010 WL 3521760, at *2–3 (E.D. Fla. Sept. 7, 2010) (citation omitted).   ERISA  §  502(c)(1)(B)  provides  that  a  plan administrator "is required . . . to furnish" by mailing the requested material to the participant or beneficiary's last known address within 30 days of the request or face personal liability "to such participant or

beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1)(B).

Defendants move for summary judgment contending (1) the individual Defendants and NCR are not the plan administrator and (2) Plaintiff failed to prove he requested the documents enumerated in 29 U.S.C. § 1024(b)(4). (Dkt. 84-1 at 28–30.) Plaintiff responds arguing NCR, the Committee, or both were required to provide him, within thirty days of his counsel's February 7, 2017 request, SPDs, Plan documents, and relevant documents pertaining to his 1969 leave of absence. (Dkt. 90 at 25.) Plaintiff contends Defendants failed to provide timely all ERISA documents Plaintiff requested for several months, and, to date, have not produced all documents relevant to the denial of Plaintiff's claim for benefits. (*Id.* at 26.) Plaintiff moves for summary judgment based on Defendants' alleged failures and asks the Court to award him statutory penalties up to $154,440. (Dkt. 83-2 at 27.)

On February 7, 2017, Plaintiff, through counsel, submitted a formal claim for benefits *to NCR*. (Dkts. 84-2 ¶ 92; 90-1 ¶ 92.) On March 9, 2017, Plaintiff, through counsel, submitted a nearly identical letter to

Edward Gallagher, NCR's General Counsel.  (*Id.*)  In both letters Plaintiff's counsel requested "copies of all documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, copies of the latest annual report (Form 5500 series), and copies of all plan documents."  (Dkts. 84-35 at 2; 84-36 at 2.) Plaintiff's February 7, 2017 letter was not provided to the Committee until after Plaintiff sent Mr. Gallagher the March 9, 2017 letter.  (Dkts. 92 at 64; 97-1 ¶ 30.)

As discussed above, NCR is not the plan administrator.  The individual Defendants also are not plan administrators.  "Proof of who is the plan administrator may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." *Hamilton*, 244 F.3d at 824 (citing *Rosen*, 979 F.2d at 193).  None of the individual Defendants served on the Committee or were involved in the review of, or decision to deny, Plaintiff's claim and appeal for benefits.  (Dkts. 84-2 ¶ 103; 90-1 ¶ 103.)  Plaintiff has never communicated with any of the individual Defendants.  (Dkts. 84-2 ¶ 104; 90-1 ¶ 104.)   The 2016 Plan provides: "The Plan Administration

Committee shall be responsible for the administration of the Plan, other than the investment and reinvestment of the assets of the Plan, and shall be the 'Plan Administrator' for the Plan." (Dkt. 84-30 at 90.) The clear language of the Plan names the Committee as the plan administrator and specifies the authority to control the Plan lies with that entity. The Committee is the plan administrator. The Court thus grants Defendants' motion as to NCR and the individual Defendants. *See Till v. Lincoln Nat'l Life Ins. Co.*, 182 F. Supp. 3d 1243, 1278 (M.D. Ala. 2016) (granting defendant's motion for summary judgment on the plaintiff's § 502(c)(1)(B) claim because the plaintiff "only made conclusory statements that [the defendant] is the de facto plan administrator").

Defendants also argue Plaintiff's claim fails because Plaintiff never requested documents enumerated in 29 U.S.C. § 1024(b)(4). (Dkt. 84-1 at 30.) "ERISA explicitly lists the materials that a plan administrator is required to disclose upon request." *Surgery Ctr. Of Viera, LLC v. Meritain Health, Inc.*, No. 6:19-cv-1694, 2020 WL 7389987, at *4 (M.D. Fla. June 1, 2020). Plaintiff's requests go far beyond what is required to be produced under ERISA. "Section 1132(c) does not authorize penalties

in connection with any and all types of information requested by the participant." *Id.* (citation omitted).  Instead,

> it refers specifically to a plan administrator's failure or refusal to provide the documents identified in Section 1024 [of ERISA], namely the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

*Surgery Ctr. Of Viera, LLC v. Cigna Health and Life Ins. Co.*, No. 6:19-cv-2110, 2020 WL 686026, at *3 (M.D. Fla. Feb. 11, 2020).  "The Eleventh Circuit has held the phrase 'other instruments under which the plan is established or operated' only 'encompasses formal or legal documents under which a plan is set up or managed.'" *Meritain Health*, 2020 WL 7389987, at *5 (quoting *Fox v. Blue Cross and Blue Shield of Fla., Inc.*, 517 F. App'x 754, 757 (11th Cir. 2013)).  "[B]ecause § 1024 specifically enumerates the types of documents to which § 1132(c) applies, penalties cannot be imposed for failure to provide documents other than those identified." *Id.* (citation omitted).  Plaintiff's counsel's requests for "all documents governing the plan" and all "plan documents" exceed § 1024(b)(4)'s scope.  But on March 27, 2017, the Committee still provided Plaintiff's counsel with Plan documents for 1969, 1972, 1974, 1976, and 2016, as well as the 2013 SPD, Summary of Material Modifications, and

the 2015 Form 5500. (Dkt. 84-37 at 3–4.)  This response was within thirty days of the Committee's receipt of the request. (Dkts. 92 at 64; 97-1 ¶ 30.)

By letter dated April 4, 2017, Plaintiff appealed the Committee's claim denial and requested "the Summary Plan Descriptions in effect in 1972, 1980 and today" and "the June 27, 2016 letter from Mr. Stanton to the NCR Benefits Center." (Dkt. 84-38 at 2.)  The only document covered by ERISA § 1024(b)(4) was the most recent SPD which had already been provided.  On May 8, 2017, the Committee still provided Plaintiff additional documents including NCR Savings and Retirement Plans Handbook, Summary of Material Modifications for the NCR Pension Plan, and Plaintiff's June 27, 2016 and July 15, 2016 letters to the NCR Benefits Center. (Dkt. 84-39 at 3–4.)

By letter dated May 13, 2017, Plaintiff's attorney requested "[c]opies of all plan documents and/or Summary Plan Descriptions in effect between 1961 and 1969" and a "complete copy of the 1974 Plan Document" since the one previously provided was missing pages. (Dkt. 84-40 at 2.)  On June 13, 2017, the Committee provided Plaintiff the Plan documents for 1963, the 1963 SPD, the 1969 and 1974 Plan documents, and the 1969 SPD. (Dkts. 84-2 ¶ 101; 90-1 ¶ 101.)

47

Plaintiff contends the Committee should have included relevant documents and correspondence pertaining to Plaintiff's alleged 1969 leave of absence, but Plaintiff's personnel files and correspondence sought are not enumerated in ERISA § 1024(b)(4).  The Committee's failure to produce them is thus insufficient to subject it to liability under ERISA § 502(c)(1)(B).

The Court thus grants Defendants' motion for summary judgment and denies Plaintiff's motion as to Plaintiff's claim for penalties under ERISA § 502(c)(1)(B).

### D.    Attorneys' Fees and Costs

Under ERISA, a district court "in its discretion may allow a reasonable attorney's fee and costs of action to either party," 29 U.S.C. § 1132(g)(1), if that party achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010). Plaintiff argues if the Court grants partial summary judgment to him, it should award attorneys' fees and costs.  (Dkt. 83-2 at 27–28.)  Because the Court denies Plaintiff's motion as to Counts I and III, the Court also denies Plaintiff's request for attorneys' fees and costs.

## III.  Conclusion

The Court **GRANTS** Defendants' Motion for Summary Judgment. (Dkt. 84.)

The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment.  (Dkt. 83.)

**SO ORDERED** this 9th day of March, 2022.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE